

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

FILED

JUL 15 2015

CLERK, US DISTRICT COURT
NORFOLK, VA

STEVEN VERNARD PARKER,

        Plaintiff,

v.

ACTION NO. 2:13cv617

GOLDEN PEANUT, LLC,

        Defendant.

## MEMORANDUM OPINION AND ORDER

This matter comes before the court on the Motion for Summary Judgment and accompanying Memorandum in Support filed by Defendant Golden Peanut, LLC ("Defendant"). Plaintiff Steven Vernard Parker ("Plaintiff") filed an Opposition to Defendant's Motion for Summary Judgment and Defendant filed a Reply. The matter is ripe for review. For the foregoing reasons, Defendant's Motion for Summary Judgment is **DENIED**.

## I. Factual and Procedural History

In August of 2009, Plaintiff applied for employment with Reliance Staffing. Decl. of Stephanie Lamb ("Lamb Decl.") ¶ 5, attached as Ex. D to Def.'s Mem. of Law in Supp. of Summ. J; Parker Dep. at 14, excerpts attached as Ex. A. to Def's Mem. of Law in Supp. of Summ. J. Reliance Staffing provides temporary employees to companies in the Hampton Roads area. Lamb Decl. ¶ 3.

Defendant is a sheller and processor of peanuts and peanut products.  Decl. of Mark David Baker ("Baker Decl.") ¶ 3, attached as Ex. J to Def.'s Mem. of Law in Supp. of Summ. J.  Plaintiff was assigned to work as a temporary equipment operator at Defendant's facility on or about September 25, 2009.  Lamb Decl. ¶ 8; Am. Compl. ¶ 1; Parker Dep. at 25.  Mr. Mark David Baker was Plaintiff's direct supervisor while Plaintiff was assigned to Defendant's facility. Am. Compl. ¶ 4; Parker Dep. at 26.  Plaintiff claims that from January 25, 2010 through January 7, 2011, he suffered racial harassment at work.  Am. Compl. ¶¶ 2, 4.  In his deposition, Plaintiff testified:

> A:  Well, Mr. Baker referred to myself, as well as other employees and regular citizens, in my presence, by different terminology as far as - the one that I witnessed and they were used on me were "black ass."  "Nigger."  Appeared to use the terminology "black bitches" referring to African-American women.  "Black monkeys" as far as myself and other employees, and "sand niggers" in reference to store owners, convenience store owners.

Parker Dep. at 27, excerpts attached as Ex. 2 to Pl.'s Mem. of Law in Opp. to Summ. J.  Plaintiff could not recall the exact number of times Mr. Baker used the term "black ass," but testified, "It depended.  If Mr. Baker had been drinking that day, it was more so than when he wasn't drinking."  Id. at 29.

Plaintiff claims that he confronted Mr. Baker about his use of discriminatory racial terms on three occasions.  Id. at 34.  The

2

first complaint occurred in 2010 after Mr. Baker told a few
African-American employees, who were sitting down on the job, to "get
their black asses up and get back to work."    Id.    Plaintiff
testified:

> A:   . . . So I asked Mr. Baker - I actually went
> up to him and talked to him and informed him this
> is a workplace and he should be - he should
> always carry himself in a professional manner.
> Q:  What did he say?
> A:   He said, if you don't like what I say,
> there's the fucking door.

Id. at 35.

Plaintiff claims that he complained a second time in 2010 after
Mr. Baker referred to an African-American employee, Darren, as a "big
black gorilla."   Id.   Plaintiff testified:

> A:   . . . And I informed Mr. Baker of Darren's
> concerns about what he said to him.  Mr. Baker,
> again, stated that if the black ass doesn't like
> the way I talk, there is the freaking door.  He
> always refer to that in that manner.

Id. at 35-36.

Plaintiff claims that he complained to Mr. Baker a third time
in 2011.   Id. at 36-38.   Mr. Baker was upset that Plaintiff and
another employee, Derrick, did not unload the contents of a truck
in a particular location.   Id. at 36. Plaintiff testified:

> A: . . . [Mr. Baker] turned, in the presence of
> - I think there were three truck drivers there
> and myself and the gentleman Derrick, and he
> said, see, you can't get these black monkeys to
> do shit right.

3

Id. at 36-37.   Following the incident, Plaintiff testified:

> A:   . . . Once the truck drivers left, I went
> to Mr. Baker and I explained to him not only did
> he  owe  us  some  apologies,  but  we  would
> appreciate if he didn't use those types of words
> around  us  or  in  reference  to  me.    I  was
> basically speaking for myself.   Mr. Baker said,
> look - it got to the point where I was coming
> to him all of the time and asking him to stop
> using - he said if I didn't like the fucking way
> he was talking, there's the door.   All right.
> I said to Mr. Baker, I said, you cannot fire me
> for   asking   you   to   stop   using   those
> terminologies.   He said, I'm not firing you; if
> you walk out that door, you quit.

Id. at 37-38.

        Plaintiff claims that he was terminated by Mr. Baker on January

12, 2011, just days after his third complaint.   Am. Compl. ¶ 3; Pl.'s

Mem. of Law in Opp. to Summ. J. at 1-2;   Parker Dep. at 55-56.

Plaintiff testified:

> A:   . . . Mr. Baker went in the office, came out,
> came directly to me and asked me for the keys,
> told me I no longer work there, I no longer work
> for him at Golden Peanut.   I asked him again
> why.   He said because I don't like - you don't
> like the way I talk, you don't like the words
> I use, you're telling me how to talk.   And I,
> again, told him, you can't fire me for asking
> you not to use those terminologies.   He told me
> to get my black ass off the property before he
> call [sic] the police.   That was it.

Parker Dep. at 56.

        Plaintiff filed a charge with the Equal Employment Opportunity

Commission ("EEOC") on January 24, 2011, alleging racial harassment,

discrimination and retaliation.   EEOC Charge, attached within Ex.

4

2 to Pl.'s Mem. in Opp. to Summ. J.  Plaintiff received his Right to Sue Letter from the EEOC on or about July 31, 2013.  Notice of Right to Sue, attached to Am. Compl.  Plaintiff filed a pro se Complaint against Defendant on October 9, 2013 and, after this court granted leave, Plaintiff filed an Amended Complaint on January 3, 2014.  In his Amended Complaint, Plaintiff claims that Defendant violated Title VII of the Civil Rights Act of 1964 ("Title VII"). Specifically, Plaintiff claims that he was harassed and terminated due to his race and that his termination was in retaliation for his complaints about discrimination.  Am. Compl. ¶ 5.

Defendant claims that it was not Plaintiff's "employer" and, therefore, cannot be held liable for any alleged violations of Title VII.  Defendant asserts that "[d]uring the entire time that [Plaintiff] was assigned to [Defendant], he remained an employee of Reliance Staffing."  Def.'s Mem. of Law in Supp. of Summ. J. at 4.

Plaintiff, on the other hand, argues that Defendant was his employer.  Plaintiff testified:

> A: . . . Ms. Lamb and Mr. Baker both told me that I was considered full-time employment at Golden Peanut.  Everything I did went through Mr. Baker.  Mr. Baker turned in my timecards. Every time I wanted a day off, I called Mr. Baker.  Mr. Baker gave me the keys to the facilities.  I had alarm codes.  I was considered a trusted employee amongst Golden Peanut.

Parker Dep. at 54.   Plaintiff claims that Defendant's "employer"

status is further supported by the fact that Mr. Baker and another

employee of Defendant, Mr. Bill Barrow, approved two raises for

Plaintiff during his time spent working at Defendant's facility.

Pl.'s Mem. of Law in Opp. to Summ. J. at 1; Employee Assignment Report,

attached within Ex. 2 to Pl.'s Mem. of Law in Opp. to Summ. J.

Regardless of its "employer" status, Defendant asserts that

Plaintiff was never racially harassed during his tenure with

Defendant and that "Mr. Baker never made racial slurs to [Plaintiff]

and he never made racial slurs in [Plaintiff's] presence."   Baker

Decl. ¶¶ 8-9.   Defendant further claims that during Plaintiff's

placement with Defendant, Plaintiff "never stated that he was the

victim of racial harassment or discrimination."   Id.

Defendant asserts that it was Plaintiff's performance problems

- not unlawful discrimination - that served as the basis for its

decision to terminate Plaintiff's assignment with Defendant.   Id.

¶ 7.   Defendant claims that Plaintiff began to exhibit "serious

behavioral problems" in late December 2010.   Id. ¶ 5.   Specifically,

Defendant claims that Plaintiff operated a forklift in a reckless

manner and caused damage to Defendant's product and property.   Id.

Defendant also claims that, on January 11, 2011, Plaintiff called

off from work, but left his work area with "a large broken sack of

peanuts with approximately 2200 pounds of peanuts littering the area,

6

broken pallets and generally an area that was left in disarray."
Lamb Decl. ¶ 15.  The next day, Defendant asserts that "Mr. Baker
advised Plaintiff that his placement with Golden Peanut was being
terminated because of his failure to correct his severe performance
problems."  Baker Decl. ¶ 7.

Plaintiff, however, disputes the existence of any performance
issues.  Plaintiff claims that he was a "trusted employee" and that
there were "[n]ever any complaints.  Never any incidents."  Parker
Dep. at 54.  With respect to the January 11, 2011, incident regarding
Plaintiff's work area, Plaintiff testified:

> Q:  On the day that you – your placement at
> Golden Peanut was terminated –
> A:  Yes.
> Q:  – did Mr. Baker confront you about the
> condition of the facilities that you had been
> working at –
> A:  No.
> Q:  – the day before?
> A:  No.  There was never any mention of any
> condition of any facilities to me.
> Q:  Really?
> A:  No.

Id. at 55.

## II.  Standard of Review

### A.  Summary Judgment Standard

Summary judgment is appropriate only when a court, viewing the
record as a whole and in the light most favorable to the nonmoving
party, determines that there exists "no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a); see Seabulk Offshore, Ltd. v. Am. Home Assur. Co., 377 F.3d 408, 418 (4th Cir. 2004). The moving party has the initial burden to show the absence of an essential element of the nonmoving party's case and to demonstrate that the moving party is entitled to judgment as a matter of law. Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 185 (4th Cir. 2004); McLean v. Patten Cmtys., Inc., 332 F.3d 714, 718 (4th Cir. 2003); see Celotex, 477 U.S. at 322-25.

When the moving party has met its burden to show that the evidence is insufficient to support the nonmoving party's case, the burden then shifts to the nonmoving party to present specific facts demonstrating that there is a genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Honor, 383 F.3d at 185; McLean, 332 F.3d at 718-19. Such facts must be presented in the form of exhibits and sworn affidavits. Celotex, 477 U.S. at 324; see also M&M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc., 981 F.2d 160, 163 (4th Cir. 1993). Failure by a plaintiff to rebut a defendant's motion with such evidence on his behalf will result in summary judgment when appropriate. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.[1]

Although a court must draw all justifiable inferences in favor of the nonmoving party, in order to successfully defeat a motion for summary judgment, the nonmoving party must rely on more than conclusory allegations, "mere speculation," the "building of one inference upon another," the "mere existence of a scintilla of evidence," or the appearance of "some metaphysical doubt" concerning a material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002); Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc., 330 F. Supp. 2d 668, 671 (E.D. Va. 2004). Rather, the evidence must be such that the fact-finder reasonably could find for the nonmoving party. See Anderson, 477 U.S. at 252.

### B. Statutory Basis and Burden of Proof

Title VII makes it unlawful for an "employer" to "discharge any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of

---

[1]Amendments to the Federal Rules of Civil Procedure, which became effective on December 1, 2010, moved the relevant language from section (c)(2) of Rule 56 to its present location in section (a). However, the advisory committee's note indicates that, despite these amendments, "[t]he standard for granting summary judgment remains unchanged." Fed. R. Civ. P. 56 advisory committee's note.

employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Title VII also prohibits retaliation against an employee, making it unlawful for "an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." Id. § 2000e-3(a).

To avert summary judgment, a plaintiff alleging discrimination and retaliation pursuant to Title VII may proceed through two avenues of proof. Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 318 (4th Cir. 2005) (citing Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284 (4th Cir. 2004)). The plaintiff may present "direct or circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor such as race motivated the employer's adverse employment decision." Id. Alternatively, the plaintiff may proceed under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

Under the McDonnell Douglas burden-shifting framework, the court must first consider whether the plaintiff has established a prima facie case of race-based discrimination. McDonnell, 411 U.S.

10

at 802. If the plaintiff fails to establish any of the essential elements of a prima facie case of discrimination, the court must grant summary judgment in favor of the defendant. Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 133-35 (4th Cir. 2002). If, on the other hand, the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a non-discriminatory reason for the difference in treatment. Bryant, 288 F.3d at 133. If the defendant articulates one or more such reasons, the burden shifts back to the plaintiff to demonstrate that the defendant's reasons were merely a pretext for discrimination. Id.

### III.   Analysis

A.   "Employer" Status

Title VII prohibits unlawful discrimination by an "employer." 42 U.S.C. § 2000e-2(a). Courts have determined that, "to be subject to liability under Title VII, a defendant must (1) fall within Title VII's statutory definition of 'employer,' and (2) have exercised substantial control over significant aspects of the compensation, terms, conditions, or privileges of plaintiff's employment." Magnuson v. Peak Tech. Servs., Inc., 808 F. Supp. 500, 507-08 (E.D. Va. 1992) (citations omitted).

In determining whether an employer-employee relationship exists for purposes of Title VII liability, "courts draw from the common law of agency definition of employee." West v. MCI Worldcom,

11

Inc., 205 F. Supp. 2d 531, 540 (E.D. Va. 2002). The "key factor"
in the court's analysis is "the hiring party's right to control the
manner and means by which the product is accomplished." Id. at 540
(citing Farlow v. Wachovia Bank of N.C., N.A., 259 F.3d 309, 213 (4th
Cir. 2001)). In addition to this "key factor," the Fourth Circuit
also considers:

> . . . the skill required; the source of the
> instrumentalities and tools; the location of
> the work; the duration of the relationship
> between the parties; whether the hiring party
> has the right to assign additional projects to
> the hired party; the extent of the hired party's
> discretion over when and how long to work; the
> method of payment; the hired party's role in
> hiring and paying assistants; whether the work
> is part of the regular business of the hiring
> party; whether the hiring party is in business;
> the provision of employee benefits; and the tax
> treatment of the hired party. No one of these
> factors is determinative.

Farlow, 259 F.3d at 313.

Under Title VII, the term "employer" is defined as "a person
engaged in an industry affecting commerce who has fifteen or more
employees for each working day in each of twenty or more calendar
weeks in the current or preceding calendar year, and any agent of
such a person." 42 U.S.C. § 2000e(b). Plaintiff's EEOC Charge
alleges that Defendant has "500 or More" employees and Defendant has
not challenged this assertion. EEOC Charge, attached within Ex. 2
to Pl.'s Mem. in Opp. of Summ. J. Accordingly, Defendant's liability

12

under Title VII will turn on whether it "exercised substantial control over significant aspects of the compensation, terms, conditions, or privileges" of Plaintiff's employment. Magnuson, 808 F.Supp. at 507-08.

Although most Title VII cases involve traditional, single employer situations, where the element of control is obvious, that is not always the case. Id. at 508. This court has explained that "the term 'employer' under Title VII should be 'construed in a functional sense to encompass persons who are not employers in conventional terms, but who nevertheless control some aspect of the individual's compensation, terms, conditions, or privileges of employment.'" Id. Such an approach "finds support in the broad remedial purpose of Title VII which militates against the adoption of a rigid rule strictly limiting 'employer' status under Title VII to an individual's direct or single employer." Id.

In Magnuson, the plaintiff filed a Title VII complaint against her employer, Peak Technical Services, Inc. ("Peak"). Peak is a staffing company "that provides employees to client corporations pursuant to service contracts." Id. at 504. In addition to Peak, the plaintiff also filed suit against the client corporation, Volkswagen of America ("Volkswagen"), with whom the plaintiff was placed by Peak to work as a field marketing specialist. Id. While the plaintiff received paychecks from Peak, evidence existed to

13

support the plaintiff's claim that Volkswagen controlled her actual work performance. Id. at 508-09. For example, Volkswagen defined many of the plaintiff's job duties and responsibilities, provided training, received reports on the plaintiff's work performance, provided a supervisor for the plaintiff, and set the plaintiff's work schedule. Id.

Relying on Amarnare v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 611 F. Supp. 344 (S.D.N.Y. 1984), a case holding that a temporary services agency and a company that contracted with the temporary services agency were both "employers" for purposes of Title VII, the court in Magnuson denied Volkswagen's motion for summary judgment. The court determined that genuine issues of material fact existed concerning Volkswagen's status as an "employer." 808 F. Supp. at 509-11.

In West, 205 F. Supp. 2d 531, decided ten years after Magnuson, this court again analyzed, for purposes of Title VII liability, the "employer" status of an entity that utilized the services of a staffing company to obtain temporary workers. The plaintiff was hired by a staffing agency to work as a temporary contractor for MCI Worldcom, Inc. ("MCI"). West, 205 F. Supp. 2d at 532. The plaintiff specialized in mainframe computer programming. Her supervisor at MCI "did not provide [plaintiff] with any directions as to how [plaintiff] should complete the tasks assigned to her concerning her

14

COBOL work." Id. at 534. Further, the evidence established that the plaintiff "largely relied on her own expertise to independently perform and complete her assignments from [her other supervisor]." Id. Additionally, the plaintiff did not receive performance evaluations, counseling, coaching or training. The plaintiff was paid by the staffing agency, not MCI, and MCI did not provide any employee-related benefits. Id. at 534, 540-41. Further, employment documents stated that the plaintiff was an employee of the staffing agency, not MCI. Nevertheless, MCI did require the plaintiff to work during certain core hours and required all leave to be approved by MCI. Id. at 534, 542. While the court found some "indicia of control" on the part of MCI, it ultimately held that they were insufficient to rise to the level of control necessary to be considered an "employer" for Title VII purposes. Id. at 542.

In the case at hand, several factors suggest that Defendant should be deemed to be an "employer" for purposes of Title VII liability. Plaintiff's job duties involved operating a forklift, dump trucks, back hoes, Bobcats, riding lawnmowers, torches, welding machines, and front-end loaders for Defendant. Parker Dep. at 25. Although Plaintiff may have previously developed an expertise in operating the various pieces of equipment, and thus did not require additional training from Defendant, the coordination and movement of Defendant's materials into the proper warehouses necessarily

15

would require significant direction and control of Defendant. Parker Dep. at 25, 50.

Additionally, Defendant's motion claims that Plaintiff had "serious behavioral problems" that continued "[d]espite repeated warnings." Baker Decl. ¶ 5. Defendant states that Mr. Baker "had conversations with [Plaintiff] about not following instructions and [Plaintiff's] sloppiness on several other occasions and that [Plaintiff] was being lazy in his work." Lamb Decl. ¶ 16. Mr. Baker further stated that "he was not going to tolerate [Plaintiff's] sloppiness, insubordination, and laziness in doing his job." Id. ¶ 17. Notably, the Employee Assignment Report states that Mr. Baker "asks [Plaintiff] to follow direction and he is determined to do it his way." Employee Assignment Report, attached within Ex. 2 to Pl.'s Mem. of Law in Opp. to Summ. J. Defendant's frustration with Plaintiff's "failure to correct his severe job performance problems" allegedly served as the basis for Defendant's termination of Plaintiff's placement with Defendant. Baker Decl. ¶ 7. Each of these facts suggests that Defendant sought to maintain a significant level of control over the manner and means of Plaintiff's work.

Further, Plaintiff testified that he was told by Mr. Baker and Ms. Lamb that he was considered to be a full-time employee of Defendant. Parker Dep. at 54. Plaintiff also testified that,

16

"[e]verything I did went through Mr. Baker.  Mr. Baker turned in my timecards.  Every time I wanted a day off, I called Mr. Baker."  Id.

Defendant points to several other factors that suggest that "employer" liability should not exist.  For example, Plaintiff only applied for employment with Reliance Staffing, Plaintiff received employee policies and guidelines from Reliance Staffing, and Plaintiff's wages were paid by Reliance Staffing, not Defendant. Parker Dep. at 14, 19-20; Lamb Decl. ¶ 9.

Based on the facts detailed above, there exists a genuine issue of material fact as to Defendant's status as Plaintiff's "employer" for purposes of Title VII liability, thus precluding summary judgment on this ground.

B.   Racial Harassment Claim

Plaintiff claims that he was harassed by Defendant because of his race.  To establish a prima facie case of a racially hostile work environment, Plaintiff must demonstrate that there was (i) unwelcome conduct; (ii) based on his race; (iii) which was sufficiently severe or pervasive to alter his conditions of employment and to create an abusive working environment; and (iv) which is imputable to the employer.   Harris  v.  Forklift  Sys., 510 U.S. 17, 21 (1993); Boyer-Liberto v. Fontainebleau Corp., No. 13-1473, 786 F.3d 264, 2015 U.S. App. LEXIS 7557, at *25-26 (4th Cir. May 7, 2015).

Notably, in discussing the "severe or pervasive" test, the Fourth Circuit recently stated:  "As we and several of our sister courts of appeal have recognized, '[p]erhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of subordinates.'" Boyer-Liberto, 2015 U.S. App. LEXIS 7557, at *34-35. The Fourth Circuit further recognized that "describing an African-American as a 'monkey,' and thereby 'suggest[ing] that a human being's physical appearance is essentially a caricature of a jungle beast[,] goes far beyond the merely unflattering; it is degrading and humiliating in the extreme.'"  Id. at *34 (alterations in original) (citations omitted).

Plaintiff claims that he was racially harassed by Defendant from January 25, 2010 through January 7, 2011.  Am. Compl. ¶¶ 2, 4. Plaintiff testified that his supervisor, Mr. Baker, called Plaintiff and other employees derogatory names including "nigger" and "black monkeys."  Parker Dep. at 27.  Defendant denies that Plaintiff was racially harassed and denies that Mr. Baker ever made racial slurs to Plaintiff; however, Defendant's summary judgment motion does not otherwise address the legal elements of Plaintiff's harassment claim.

Through the pleadings and his deposition, Plaintiff has raised genuine issues of material facts with respect to his racial harassment claim.  Although Defendant denies Plaintiff's factual assertions, this court cannot make determinations of credibility at the summary judgment stage.  Ferrell v. Harris Ventures, Inc., 812 F. Supp. 2d 741, 746 (E.D. Va. 2011).  Accordingly, summary judgment is inappropriate for Plaintiff's racial harassment claim.

## C.  Discriminatory Termination Claim

Plaintiff claims that he was terminated by Defendant because of his race.  Am. Compl ¶ 5.  To establish a prima facie case of discrimination based on disparate treatment, Plaintiff must show that (i) he is a member of a protected class; (ii) he had satisfactory job performance; (iii) he suffered an adverse employment action; and (iv) he was treated differently than similarly situated employees outside of his protected class.  Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010).

It is uncontested that Plaintiff is a member of a protected class.  Further, Plaintiff testified that he was a "trusted employee" who never experienced any "complaints" or "incidents" while working at Defendant's facility.  Parker Dep. at 54-55.  Additionally, Plaintiff testified that Mr. Baker terminated Plaintiff from his assignment with Defendant and, in doing so, told Plaintiff to get his "black ass off the property."  Id. at 55-56.

Defendant claims that summary judgment is warranted on Plaintiff's discriminatory termination claim because (i) Plaintiff was not performing at a level that met Defendant's legitimate expectations, (ii) Plaintiff did not suffer an adverse employment action, as he remained employed by Reliance Staffing, and (iii) Plaintiff cannot rebut Defendant's nondiscriminatory reason for the assignment termination (i.e., the performance issues).

Plaintiff's job performance is clearly disputed by the parties. Defendant claims that Plaintiff's poor job performance necessitated his termination, while Plaintiff asserts that his job performance was never questioned. As noted above, such determinations of credibility are inappropriate at the summary judgment stage. Ferrell, 812 F. Supp. 2d at 746.

Further, a plaintiff may suffer an adverse employment action "without showing that he was subjected to an 'ultimate employment decision,' i.e., a firing, layoff, or failure to promote." Peary v. Goss, 365 F. Supp. 2d 713, 722 (E.D. Va. 2005). As such, Defendant's argument regarding the lack of an adverse employment action is unavailing.

For these reasons, summary judgment is inappropriate on Plaintiff's discriminatory termination claim.

### D. Retaliation Claim

To establish a claim of retaliation under Title VII, Plaintiff must show that (i) he engaged in protected activity; (ii) his employer acted adversely against him; and (iii) there was a causal connection between the protected activity and the adverse action. EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 406 (4th Cir. 2005).

Defendant argues that Plaintiff's retaliation claim fails because Plaintiff "concedes that he did not tell anyone at Reliance Staffing about the alleged racial harassment until after his temporary assignment at [Defendant] had already been terminated." Def.'s Mem. in Supp. of Mot. for Summ. J. at 17. Defendant's argument misperceives the basis of Plaintiff's retaliation claim.

Plaintiff testified that, on three separate occasions, Plaintiff complained to his supervisor, Mr. Baker, regarding his use of racially discriminatory language in the workplace. Parker Dep. at 34-38, 55-56. Complaints to a supervisor regarding the use of racial slurs and discriminatory language can constitute "protected activity" under Title VII.

Plaintiff further claims that he was terminated from his placement at Defendant's facility by Mr. Baker days after his third complaint. Am. Compl. ¶ 3; Pl.'s Mem. of Law in Opp. to Summ. J. at 1-2; Parker Dep. at 55-56. Such assignment termination can constitute an adverse action for purposes of a retaliation claim.

21

See Shetty v. Hampton Univ., No. 4:12cv158, 2014 U.S. Dist. LEXIS 9880, at *40 (E.D. Va. Jan. 3, 2014)(noting that the adverse action required for a retaliation claim "need not be an ultimate employment decision, but must be 'materially adverse,' meaning 'it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination'") (citations omitted).

Finally, Plaintiff testified that, upon inquiry as to the reason for his termination, Mr. Baker stated: "because I don't like - you don't like the way I talk, you don't like the words I use, you're telling me how to talk." Parker Dep. at 56. Plaintiff's testimony, if believed, provides support for a causal link between Plaintiff's complaints and his termination.

Defendant also argues that Plaintiff's retaliation claim cannot survive summary judgment because Plaintiff "cannot rebut [Defendant's] non-retaliatory reason for ending his temporary placement." Def.'s Mem. in Supp. of Mot. for Summ. J. at 18. Defendant claims that Plaintiff was terminated because of performance issues, including operating a forklift "in a reckless and unsafe manner causing damage to the Company's product and property despite repeated warnings." Id.

As noted above, Plaintiff denies the existence of performance problems and testified that he was never the subject of complaints or incidents while working at Defendant's facility. Parker Dep. at

54.   Plaintiff further denied that there were any problems with his work area on the day before his assignment was terminated.   <u>Id</u>. at 55.

Accordingly, the court finds that genuine disputes of material facts exist that preclude summary judgment on Plaintiff's retaliation claim.

### IV.   Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is **DENIED**.

The Clerk is **DIRECTED** to send a copy of this Memorandum Opinion and Order to Plaintiff and to counsel for Defendant, and to set a date for the Final Pretrial Conference and the trial of the case.

IT IS SO **ORDERED**.

/s/

Rebecca Beach Smith
Chief Judge

July  15  , 2015

23